UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 22, 2018

NICHOLAS WEIR,

                    Plaintiff,

         v.

MONTEFIORE MEDICAL CENTER, ALBERT
EINSTEIN COLLEGE OF MEDICINE and
YESHIVA UNIVERSITY,

                  Defendants.

------------------------------------------------------X

16 Civ. 9846 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

     For three months, Plaintiff Nicholas Weir worked as a research technician in a lab at the Albert Einstein College of Medicine. His employment was contingent upon successful completion of this probationary period, but at the end of the period, he was terminated. Plaintiff now brings claims against Montefiore Medical Center, Albert Einstein College of Medicine, and Yeshiva University (collectively, "Defendants"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 8-131 ("NYCHRL"). Plaintiff's Amended Complaint alleges that he had acrimonious interactions with other members of the lab; that Defendants impermissibly retaliated against him; and that he was wrongfully terminated. Defendants move to dismiss Plaintiff's Amended Complaint on the basis that he has not plausibly pleaded an

inference of discriminatory motivation. Because the Court agrees with Defendants, the motion is granted.

**BACKGROUND**[1]

**A.  Factual Background**

Plaintiff is "a male with a dark complexion from Jamaica." (Am. Compl. ¶ 1).  On December 7, 2015, Plaintiff was hired to be a research technician in the lab of Dr. Evripidis Gavathiotis at the Albert Einstein College of Medicine ("AECOM"), and he began working there on December 28, 2015.  (*Id.* at ¶¶ 2-3).  Plaintiff was given several versions of an offer letter from AECOM, all of which provided that he would begin with a 90-day "probationary period," during which time both Plaintiff and AECOM retained the option of terminating his employment.  (Pl. Decl., Doc. 1).[2]

At the time of his hire, Plaintiff was the only research technician in the lab, and he was the only lab employee of Caribbean descent.  (Am. Compl. ¶ 4).[3]  Plaintiff assisted Dr. Gavathiotis and others in the lab; by his second week, Dr. Gavathiotis asked Plaintiff to work overtime "because [Plaintiff] had a

---

[1]     This Opinion draws facts primarily from the Amended Complaint (Dkt. #20 ("Am. Compl.")).  Because Plaintiff is proceeding *pro se*, the Court also considers any factual allegations contained in Plaintiff's statements during the pre-motion conference and in his written submissions in opposition to this motion (*see, e.g.*, Dkt. #29 ("Pl. Decl.")).  The Court's ability to consider facts alleged outside the Amended Complaint is addressed later in the text.  For convenience, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #24); to Plaintiff's opposition to Defendants' motion as "Pl. Opp." (Dkt. #28); and to Defendants' reply brief as "Def. Reply" (Dkt. #30).

[2]     Plaintiff has labeled the documents attached to his declaration as "Doc. 1," "Doc. 2," and so forth.  The Court will use Plaintiff's nomenclature to refer to these documents.

[3]     Plaintiff alleges that the lab employed "two Asians, three Caucasians, [and] two light skinned Hispanics."  (Am. Compl. ¶ 15).

good work ethic and was 'extremely motivated.'" (*Id.* at ¶¶ 5-6).[4]  In the early weeks of his employment, Plaintiff "regularly received positive reviews," and, by "mid-January 2016, [Dr.] Gavathiotis and other researchers working in the [l]ab began compl[i]menting [Plaintiff] on his work ethic and ability." (*Id.* at ¶ 7; *see also id.* at ¶ 8).  By late January 2016, Dr. Gavathiotis told Plaintiff he wanted Plaintiff to work in his lab for "a couple of years." (*Id.* at ¶ 9).

But then, by Plaintiff's telling, things changed for the worse.  Later in January 2016, "[Dr.] Gavathiotis and other researchers in the lab started harassing [Plaintiff] and treating him differently than other employees." (Am. Compl. ¶ 10).  For example, Onyinyeckukwu Uchime, an M.D./Ph.D. student, "began coming to the lab more often and harassing [Plaintiff]"; she questioned Plaintiff's lab results even though these same results had been praised by Dr. Gavathiotis and others.  (*Id.*).  Plaintiff alleges that as Ms. Uchime asked Plaintiff about these lab results, she spoke to him in such an "elevated" tone of voice that workers in an adjacent lab "could hear her scolding [Plaintiff]." (Pl. Opp. 5).  Ms. Uchime would become angry when Plaintiff borrowed her lab equipment, but she would not react angrily to other employees who borrowed her equipment.  (Am. Compl. ¶ 11; *see also* Pl. Opp. 5 ("She was spitefully nasty to me for borrowing her equipment but would not get annoyed when other lab members borrowed her lab equipment.")).

---

[4]     Plaintiff acknowledges that he was compensated for his overtime work, and does not raise any claims stemming from this fact.  (Am. Compl. ¶ 6).

"Around this time[,] [Plaintiff] was forced to move from his regular work station," and he became the only researcher in the lab without a regular work area. (Am. Compl. ¶ 11). It is not clear from the Amended Complaint whether Plaintiff's move from his work station happened because of his disagreements with Ms. Uchime or was merely coincidental. Plaintiff alleges in his opposition brief that he initially sat at a desk previously occupied by a lab worker named Dennis; when Dennis returned to the lab, Plaintiff moved to a desk previously occupied by Ms. Uchime. After Ms. Uchime returned to the lab, and after Plaintiff's interactions with her escalated, he moved back to Dennis's desk, but if Dennis needed the desk, Plaintiff was left with no workstation. (Pl. Opp. 5).

Plaintiff further alleges that in late February 2016, Dr. Gavathiotis failed to tell Plaintiff about a "lecture he was giving to people in the [l]ab." (Am. Compl. ¶ 12). Other lab members were invited. (Pl. Opp. 7). And Plaintiff states that his colleagues at some point asked him "which country [he] was from"; he contends that while "it may appear[] to be a simple and amicable question, one cannot definitively conclude there wasn't any motive behind such a question." (*Id.* at 5-6).

By late February 2016, Dr. Gavathiotis "began coming up with different reasons for terminating [Plaintiff]." (Am. Compl. ¶ 13). Despite having personally hired Plaintiff, Dr. Gavathiotis "stated that he was looking for someone with different experience than [Plaintiff]." (*Id.*). Plaintiff alleges that Dr. Gavathiotis told Plaintiff that he needed someone who had experience working with mice — even though he knew at the time of hiring that Plaintiff

had no such experience. (Pl. Opp. 8). Shortly thereafter, Dr. Gavathiotis told Plaintiff that he "didn't fit in" at the lab and that "other lab members did not trust [Plaintiff]." (Am. Compl. ¶¶ 14, 16). Dr. Gavathiotis was "visibly angry" as he said this. (Pl. Opp. 8). Dr. Gavathiotis told Plaintiff that a lab worker named Xiomaris — with whom Plaintiff believed he had a productive working relationship — had complained about him. (*Id.* at 6). Plaintiff alleges that this complaint was fabricated. (*Id.*). After this, Plaintiff began working with Dr. Biris, who, Plaintiff claims, was "very impressed that [Plaintiff] obtained good results on [his] first attempts on mostly [his] own." (*Id.*). Plaintiff adds that Pavlos, another lab member, had been "unable to get positive results." (*Id.*).

Dr. Gavathiotis then began to give Plaintiff mixed signals: In late February 2016, he told Plaintiff that the lab would be able to fund Plaintiff's position until the end of March 2016 (Am. Compl. ¶ 17); a few days later, he told Plaintiff that Plaintiff's last day in the lab would be March 4, 2016, but that he could return to the lab as a volunteer (*id.* at ¶ 18).[5] On March 3, 2016, Plaintiff went to AECOM's Human Resources ("HR") Department "to report the treatment he was experiencing." (*Id.* at ¶ 19).[6] There, he spoke with Anna Gartner, an HR specialist, who informed him that "he could not be fired 'without a legitimate reason.'" (*Id.* at ¶ 20). Plaintiff returned to the lab after

---

[5] The Amended Complaint says that Dr. Gavathiotis told Plaintiff "that his last day at the [l]ab would be March 4, 2017." (Am. Compl. ¶ 18). The Court infers from other facts in the record that the correct date is March 4, 2016.

[6] Plaintiff's Amended Complaint alleges one meeting with HR on March 3, 2016. (Am. Compl. ¶¶ 19-20). Plaintiff's opposition brief alleges two meetings with HR, one on March 2, 2016, and one on March 3, 2016. (Pl. Opp. 7-8).

his meeting with Ms. Gartner, at which time Dr. Gavathiotis "told him to pack up his things and [ ] leave." (*Id.* at ¶ 21). Plaintiff contends that he asked for time to complete a project but was escorted out by security. (Pl. Opp. 8).

Plaintiff takes pains to note that Dr. Gavathiotis is not "a racist," but that "the big guys upstairs and money [] got the best of Dr. Gavathiotis." (Pl. Opp. 7). Plaintiff alleges that "these influences … brought the ugly out of Dr. Gavathiotis[,] which ultimately resulted in the changes and discrimination [Plaintiff] experienced." (*Id.*). A few days after his termination, Plaintiff emailed Robert Cancellieri, AECOM's Director of HR. (Am. Compl. ¶ 22). Mr. Cancellieri responded that Plaintiff "was fired because he did not pass his probation[ary] period." (*Id.*).

Plaintiff's opposition brief makes a series of factual allegations that largely echo those in his Amended Complaint. (*See* Pl. Opp. 3-9). More detail is provided, however, concerning "the big guys upstairs," and the true reasons for Plaintiff's termination at AECOM. Plaintiff alleges that he has been the subject of various reprisals from the City University of New York ("CUNY"), where he attended college, and the State of New York — both of which have conspired to coerce Plaintiff to enlist in the military. (*Id.* at 3). Plaintiff alleges that he has "been monitored and stalked daily since around October 2015" and, indeed, believes that New York state agencies were aware of his job at AECOM. (*Id.* at 3-4). As but one example, Plaintiff noticed that he was being "stalked/monitored by state agencies" when he would leave the lab in the evenings. (*Id.* at 4). Plaintiff went so far as to file a claim in the New York

Court of Claims in 2015, but has been "unable to get any impartial judge at the state level." (*Id.* at 3).[7]

When Plaintiff spoke with Ms. Gartner in HR on March 2, 2016, he explained his "lab situation and that it was due to my ongoing court case against CUNY and the State of New York[.]" (Pl. Opp. 7-8). Plaintiff attempted to tell Ms. Gartner more about this court case the next day, but "she asked [Plaintiff] to stop telling her [about his] court case," and as soon as he returned to the lab, he was terminated. (*Id.* at 8).

At a pre-motion conference with the parties, the Court questioned Plaintiff about his claims in order to gain a clearer understanding of the alleged discrimination. When asked to explain what "led [Plaintiff] to believe that [he was] subject to discrimination," Plaintiff responded that "discrimination was just a, it was a miniscule of the core reason why [he] was terminated." (Dkt. #25-4 ("Conf. Tr.") 26:12-21). Instead, Plaintiff explained, he was terminated because of the lawsuit he had filed in the New York Court of Claims against CUNY and the State of New York. (*Id.* at 26:12-28:21).

For the first time, Plaintiff alleges in his opposition brief that his compensation was reduced a few days after he began working in the lab. (Pl. Opp. 4). He reached out to the administrator of the Biochemistry Department to inquire about "some mysterious words on [his] first paystub" and about certain hours that were missing. (*Id.*). Plaintiff states that, while he did not get

---

[7]     Plaintiff later alleges that he did not file this suit until April 2016. (Pl. Opp. 9). For reasons stated below, the timing of Plaintiff's suit is not material to resolution of the instant claims.

an explanation for this discrepancy, the missing hours were subsequently

added back. (*Id.* at 5).

**B.    Procedural History**

Plaintiff initiated this suit on December 20, 2016. (Dkt. #2). On

April 20, 2017, Defendant requested leave to file a motion to dismiss (Dkt.

#13), and the Court held a pre-motion conference on May 4, 2017 (Dkt. #19).

The Court granted Plaintiff leave to amend his complaint (*id.*), and he filed the

Amended Complaint on July 6, 2017 (Dkt. #20). Defendants then moved to

dismiss the Amended Complaint on August 18, 2017. (Dkt. #23). Plaintiff filed

an opposition brief and a declaration in support of his opposition on October 4,

2017. (Dkt. #28-29). This motion became fully briefed when Defendants filed

their reply brief on October 18, 2017. (Dkt. #30). On November 14, 2017,

Plaintiff filed a letter with the Court asking for leave to amend his complaint

once more and for the matter to proceed to discovery. (Dkt. #32). The Court

addresses this request below.

## DISCUSSION

**A.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

When considering a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s]

favor, assume all well-pleaded factual allegations to be true, and determine

whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life

Ins. Co.,* 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly,* 550 U.S. 544, 570 (2007)).  While this plausibility requirement "is not akin to a probability requirement … it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*

That said, *pro se* litigants are afforded a special solicitude:  A court must construe *pro se* submissions liberally "to raise the strongest arguments that they suggest."  *Cruz* v. *Gomez,* 202 F.3d 593, 597 (2d Cir. 2000) (internal quotation marks omitted).  In this regard, a court may consider factual allegations made in a *pro se* litigant's submissions opposing a motion to dismiss.  *See Walker* v. *Schult,* 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.").  And while a plaintiff's pleadings are typically limited to the complaint itself and any documents "attached to it as an exhibit or any statements or documents incorporated in it by reference," *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995) (internal quotation marks and citation omitted), a court may also consider documents submitted with a *pro se* litigant's moving papers, *see Gill* v. *Mooney,* 824 F.2d 192, 194 (2d Cir. 1987) (upholding district court's consideration of an affidavit filed by a *pro se* plaintiff in opposition to a motion to dismiss); *see generally Reeves* v. *City of Yonkers,* No. 16 Civ. 2223 (KMK),

2017 WL 2275025, at *5 (S.D.N.Y. May 24, 2017) (discussing propriety of considering documents appended to motion papers of *pro se* litigants (citing *Agu* v. *Rhea*, No. 09 Civ. 4732 (JS), 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010))).

Where Plaintiff himself had actual notice of the documents and used them in drafting his pleadings, the Court's concern about considering matters outside the pleadings is not present. *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Accordingly, the Court will consider the statements made during the pre-motion conference and the documents Plaintiff submitted in opposition to Defendants' motion.

## B. Each of Plaintiff's Title VII Claims Fails

Plaintiff's Amended Complaint raises claims of discrimination, retaliation, and hostile work environment in violation of Title VII. His opposition brief alleges an equal pay claim, also under Title VII. The Court will address each in turn.

### 1. Discrimination

To survive Defendants' motion to dismiss his Title VII claim, Plaintiff must satisfy a "minimal burden of alleging facts suggesting an inference of discriminatory motivation." *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (internal quotation marks omitted); *accord Littlejohn* v. *City of N.Y.*, 795 F.3d 297, 310-11 (2d Cir. 2015). At the pleadings stage, "Title VII … requires a plaintiff asserting a discrimination claim to allege two elements: [i] the employer discriminated against him [ii] because of his race,

color, religion, sex, or national origin." *Vega*, 801 F.3d at 85. The first element is established by showing an adverse employment action. *Id.* The second element is satisfied where a plaintiff's race or national origin "was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the [adverse employment] action." *Id.* While evidence of discriminatory intent is often "elusive," a plaintiff alleging discrimination is not relieved of the traditional plausibility pleading standard. *Id.* at 86. Plaintiffs may "rely on 'bits and pieces' of information to support an inference of discrimination" such that they may construct "a 'mosaic' of intentional discrimination." *Id.* (citation omitted).

Even taking all of Plaintiff's well-pleaded allegations as true and drawing all reasonable inferences in his favor, the Court cannot find that Plaintiff has met this liberal pleading standard. There is no question that Plaintiff's termination was an adverse employment action sufficient to satisfy the first element. But the Amended Complaint — including Plaintiff's moving papers — do not plausibly suggest that he was terminated "because of his race, color, … or national origin." Plaintiff alleges "bits and pieces" of conduct he believes arise from a discriminatory motive but these cannot create the "mosaic" that is necessary here to allege an inference of discrimination.

To review, Plaintiff alleges that he was initially praised for his work as a research technician in Dr. Gavathiotis's lab, but was later criticized and complained about by his co-workers. Dr. Gavathiotis further told Plaintiff that his co-workers did not trust him and that he "did not fit in." Then, after telling

Plaintiff that he could stay on for several years, Dr. Gavathiotis told Plaintiff that his position could only be funded until the end of March 2016 — the end of his 90-day probationary period. Even then, Plaintiff was abruptly let go at the beginning of the month.

Plaintiff does little to explain how these remarks by his co-workers and supervisor stem from discriminatory animus. Plaintiff alleges that a co-worker asked him a question about his national origin — a question that Plaintiff concedes could be innocuous — but he does not allege that anyone in the lab openly verbalized racial animus toward him. Recognizing that such instances are rare, however, courts also look to other indicia of discrimination, such as "the more favorable treatment of employees not in the protected group," *Littlejohn*, 795 F.3d at 312, and the "totality of the relevant facts," *Washington* v. *Davis*, 426 U.S. 229, 242 (1976). Plaintiff has not proffered any comparators or alleged that anyone else in the lab was treated better than he was. Of course, Plaintiff does not allege that any other lab employees were fired — suggesting that they were all treated better than he, at least in this respect — but the Court is reluctant to assume facts based solely on the absence of an allegation to the contrary.

Plaintiff's principal (indeed, sole) evidence is Dr. Gavathiotis's statement that he "did not fit in." Plaintiff alleges that Dr. Gavathiotis was "visibly angry" as he said this. But Plaintiff offers nothing beyond his own perception of the remark to explain how it speaks to a discriminatory motive by Dr. Gavathiotis. Even though Plaintiff alleges other unkind remarks from co-workers, none of

these indicates any animus toward Plaintiff based on his race, color, or national origin — by Plaintiff's own account, all of the comments related to Plaintiff's use of lab equipment or his work in the lab. To find an inference of discrimination, the Court must do more than speculate as to the meaning of Dr. Gavathiotis's off-handed remark, and cannot find that this remark plus the lab employees' complaints are enough to discharge Plaintiff's burden. *See Johnson* v. *N.Y. City Dep't of Educ.*, 39 F. Supp. 3d 314, 324 (E.D.N.Y. 2014) (holding that comment that plaintiff "did not fit in" was not discriminatory without further indication of discriminatory motive), *aff'd*, 633 F. App'x 42, 43 (2d Cir. 2016) (affirming holding that meaning of the "fit in" comment depends on context); *cf. Goodwine* v. *City of N.Y.*, No. 15 Civ. 2868 (JMF), 2016 WL 3017398, at *7 (S.D.N.Y. May 23, 2016) (holding that remark that the plaintiff "would not 'fit in'" gave rise to a discrimination claim where plaintiff "despite her superior qualifications, ... was repeatedly passed over for job vacancies or promotions in favor of predominantly white, predominantly male applicants"); *Kelly* v. *Metro-North Commuter R.R.*, No. 87 Civ. 5817 (JFK), 1989 WL 156298, at *5-6 (S.D.N.Y. Dec. 18, 1989) (finding statement that Orthodox Jewish plaintiff "did not fit in" referred to plaintiff's religion, where supervisor also made derogatory comments and complained about plaintiff's absences for religious observance).

This case is also readily distinguishable from *Abrams* v. *Department of Public Safety*, where the Second Circuit held that comments that the plaintiff "did not fit in" gave rise to a genuine dispute of fact sufficient to defeat

summary judgment. 764 F.3d 244, 252 (2d Cir. 2014). Abrams, an African-American detective, had been repeatedly passed over for promotion to an elite squad in favor of white detectives. *Id.* at 248. There was no indication in the record that Abrams lacked the qualifications for the squad, and twice when he was not promoted supervisors remarked that Abrams "did not fit in" or that another detective would be a "better fit." *Id.* at 249. One of Abrams's supervisors (not involved in the promotion decision) testified at a deposition that the "better fit" comment could have been about race. *Id.* The Second Circuit held that the district court overlooked the reasonable inference that these comments related to Abrams's race, even as it observed that his was "a very close case." *Id.* at 253-54.

This is not a very close case. Here, Plaintiff was not repeatedly denied promotions or passed over in favor of others outside his protected class. Plaintiff was not employed by Defendants long enough to experience such treatment. Plaintiff was hired subject to satisfactory completion of a probationary period, and at the end of that period he was not kept on. Certain co-workers complained, sometimes vociferously, about Plaintiff's use of the lab space and others complained about the quality of his work. Dr. Gavathiotis equivocated about Plaintiff's experience — he hired Plaintiff knowing of Plaintiff's comparative lack of experience, but later cited it as a basis for his termination. And Dr. Gavathiotis told Plaintiff he "didn't fit in." His words were inartful, to be sure. But Plaintiff's pleadings do not present a sufficient

basis to "nudge[ his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Indeed, Plaintiff's own account of his termination in his opposition papers confirms that Dr. Gavathiotis's statements were not made with a discriminatory purpose:

> I have to be frank and impartial about the character of Dr. Gavathiotis based on the interactions I had with him. I would disagree with the notion that he is a racist. ... It was the big guys upstairs and money which got the best of Dr. Gavathiotis. It was unfortunate but it was these influences that brought the ugly out of Dr. Gavathiotis which ultimately resulted in the changes and discrimination I experienced.

(Pl. Opp. 7).

Plaintiff's opposition papers also underscore that any disparate treatment of him at AECOM was not the product of discriminatory animus. Plaintiff explains that he told Anna Gartner in HR that his "lab situation" "was due to my ongoing court case against CUNY and the State of New York." (Pl. Opp. 7-8). In both his opposition brief and at a pre-motion conference with the Court, Plaintiff stated that New York State agencies were aware of his employment at AECOM *and* "ha[d] an incentive to get [Plaintiff] out of the lab, because indirectly, from college, they had been trying to ... coerce [Plaintiff] to join the military." (Conf. Tr. 28:24-29:1; Pl. Opp. 3-4). When the Court asked Plaintiff whether he "believe[d] there came a time when the military was aware of [his] position at [AECOM] and interfered," Plaintiff responded, "[d]efinitely," and cited the comments by Ms. Uchime and the changes he experienced in the lab in support of this belief. (*Id.* at 34:4-35:4).

The merits of Plaintiff's claims against New York State and CUNY are not before the Court, nor do they inform the outcome of this motion. What the claims do is speak to an explanation, proffered by Plaintiff himself, for his experiences while in Defendants' employ that fatally undermines his allegation of a discriminatory motive based on his race, color, or national origin. Even on a liberal reading of Plaintiff's pleadings and moving papers, the Court cannot find that the "bits and pieces" on which Plaintiff relies suffice to construct the minimal inference of discrimination he needs to survive Defendants' motion to dismiss.

## 2. Retaliation

To state a claim for retaliation under Title VII, a "plaintiff must plausibly allege that: [i] defendants discriminated — or took an adverse employment action — against him, [ii] 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90 (quoting 42 U.S.C. § 2000e-3(a)). For a retaliation claim, the definition of an adverse employment action is broader than that for a claim of discrimination. In a retaliation claim, a plaintiff must allege "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 57 (2006)). Making complaints to internal management can constitute protected activity under Title VII. *Kotcher* v. *Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (1992). A plaintiff must also plausibly allege but-for causation, i.e., that "the adverse action would not have occurred in the absence of the retaliatory motive." *Vega*, 801 F.3d at 91.

Plaintiff may show causation through timing — specifically, "protected activity followed closely in time by adverse employment action." *Id.* at 90.

As set forth in his Amended Complaint, Plaintiff's retaliation claim is temporally implausible. Plaintiff alleges that "in or around late February" Dr. Gavathiotis told Plaintiff that the lab could fund Plaintiff's position until the end of March, but that "a few days after" this, Dr. Gavathiotis told him that his last day in the lab would be March 4, 2016. (Am. Compl. ¶¶ 17-18). Plaintiff alleges that on March 3, 2016, he went to the HR Department "to report the treatment he was experiencing," but that when he returned to the lab he was asked to pack his belongings and leave. (*Id.* at ¶¶ 19-21). Thus, it appears from Plaintiff's Amended Complaint that he reported the alleged discrimination *after* Dr. Gavathiotis decided to terminate him, thereby negating the possibility that his termination would not have occurred but for Defendants' retaliatory motive.

Plaintiff's opposition brief alleges a different sequence of events. There, Plaintiff states that he spoke to Anna Gartner on March 2, 2016, and told her about his "lab situation and that [the situation] was due to [Plaintiff's] ongoing court case against CUNY and the State of New York because of the similar occurrences that were taking place." (Pl. Opp. 7-8). And Plaintiff claims that *after* this meeting, Dr. Gavathiotis called Plaintiff into his office and "made up a number of excuses to terminate [Plaintiff's] job," including that Plaintiff did not have the required experience and that other lab members were distrustful of Plaintiff. (*Id.* at 8). It was then that Dr. Gavathiotis told Plaintiff his last day

would be March 4, 2016. (*Id.*). Plaintiff further alleges that on March 3, 2016, he went back to Ms. Gartner's office and "provided more details of [his] court case," and that, upon his return to the lab, Dr. Gavathiotis told him to leave. (*Id.*).[8]

While this sequence of events better supports Plaintiff's claim, Plaintiff is nonetheless unable to meet his burden to allege but-for causation. As Defendants correctly note, Plaintiff never alleges that Dr. Gavathiotis knew about this lawsuit. (Def. Br. 13). In fact, Plaintiff expressly states in his opposition brief that he did not tell Dr. Gavathiotis about his experience with New York State and CUNY because he "did not want to alarm Dr. Gavathiotis about [his] personal issues and cause any unnecessary problem." (Pl. Opp. 4). Plaintiff's oblique reference to Dr. Gavathiotis being "influence[d]" by the "big guys upstairs" (*id.* at 7), does not plausibly indicate that Dr. Gavathiotis acted out of an impermissible motivation to retaliate against Plaintiff for filing a lawsuit against New York State and CUNY. And given Plaintiff's concessions in his pleadings about other reasons for his termination — namely, criticism from his colleagues and Dr. Gavathiotis about his work — the Court cannot find that Plaintiff has adequately stated a claim for retaliation based on his complaints to HR or his lawsuit in the New York Court of Claims.

---

[8]     Plaintiff alleges he did not file his suit against New York State and CUNY until April 7, 2016, after his termination from AECOM. (Pl. Opp. 9). Because Plaintiff alleges that he told Defendants about this court case, whether it was filed or merely contemplated, the Court accepts this as true and does not hinge its consideration of Plaintiff's claim on whether the suit had in fact been filed at the time Plaintiff discussed it with the HR Department.

### 3.     Hostile Work Environment

"To establish a hostile work environment under Title VII[,] … a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Plaintiff must plausibly allege that he "subjectively perceive[d] the work environment to be abusive" *and* that "a reasonable person would find it hostile or abusive." *Id.* at 21. A court must "consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks and citation omitted).

Plaintiff's claim fails. The allegations in the Amended Complaint are much like those alleged unsuccessfully in *Littlejohn*. There, the plaintiff alleged that her supervisor made "negative statements" about her, "used harsh tones" with her, avoided her and declined to meet with her, "wrongfully reprimanded" her, made a sarcastic remark about the plaintiff's feeling of being excluded, and told her that she "did not understand the culture" of the workplace. *Littlejohn*, 795 F.3d at 321. Here, Plaintiff alleges that Ms. Uchime reacted angrily to him when he borrowed her lab equipment and raised her voice to the point where others in an adjacent office could hear; Ms. Uchime questioned his

19

work; Dr. Gavathiotis told him he "did not fit in" and told him that other lab employees had complained about his work; Dr. Gavathiotis failed to invite him a lecture; and Plaintiff did not have a regular work station. It is clear from his pleadings that Plaintiff subjectively believed the lab to be a hostile work environment. But the Court agrees with Defendants that these allegations do not plausibly suggest that Plaintiff's workplace was so toxic as to interfere with his performance — in point of fact, he alleges he performed above expectations — or effect a change in the conditions of his employment. *Id.* (collecting cases). (*See generally* Def. Br. 13-14).

### 4. Equal Pay

Plaintiff also brings a pay discrimination claim under Title VII (Pl. Opp. 16), which claim is analyzed under the same framework as a claim under the Equal Pay Act of 1963 ("EPA"), Pub. L. No. 88-38, 77 Stat. 56. *Talwar* v. *Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 n.2 (2d Cir. 2015) (summary order) (citing *Belfi* v. *Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999)). But while the EPA imposes strict liability, Title VII "requires proof of discriminatory intent." *Belfi*, 191 F.3d at 135. Thus to state a claim for pay discrimination under Title VII, a plaintiff must establish the elements of a claim under the EPA — "[i] []he is a member of a protected class; and [ii] []he was paid less than non-members of [his] class for work requiring substantially the same responsibility" — and that the pay discrepancy was occasioned by circumstances giving rise to an inference of discrimination. *See id.* at 139.

In his opposition brief, Plaintiff makes factual allegations about confusion over his paystubs. (Pl. Opp. 4-5, 16). Plaintiff alleges that he reached out to Leslie Jefferson, the administrator for the Biochemistry Department to inquire about "some mysterious words on [his] first paystub." (*Id.* at 4). He also alerted Ms. Jefferson to several hours that he believed were missing from his paystub. (*Id.*) Though Ms. Jefferson did not provide clarity as to the verbiage, she did add the hours that were missing from Plaintiff's paystub. (*Id.* at 4-5). Because Plaintiff does not allege any wrongdoing by Defendants as to his missing hours, the Court will not construe this series of allegations to support Plaintiff's claim for pay discrimination.

Plaintiff further alleges that his pay rate was reduced after he started working in the lab. (Pl. Opp. 4). Plaintiff attaches to his declaration three versions of an offer letter from AECOM. (Pl. Decl., Doc. 1). The first letter, dated December 7, 2015, states that Plaintiff's rate of pay will be $22.77 per hour and will increase to $23.34 per hour following his 90-day probationary period. (*Id.*). The second letter, dated December 18, 2015, gives the same rates. (*Id.*). The third letter, dated December 30, 2015 — which Plaintiff signed — states that Plaintiff's rate of pay will be $21.25 per hour and will go up to $21.78 per hour following the probationary period. (*Id.*). Plaintiff also attaches a Notice of Acknowledgement of Pay Rate and Payday that recites that his pay rate is $21.25 per hour. (*Id.*). There is no explanation in the documents presented by Plaintiff for why his pay rate was reduced from Defendants' initial offer, but the pleadings are likewise devoid of any allegations

that Plaintiff was paid less than any employees outside his protected class or that these employees performed similar work. Plaintiff has failed to allege a plausible claim of pay discrimination.

## C. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's NYSHRL and NYCHRL Claims

Because Plaintiff has not plausibly alleged a violation of Title VII, the Court declines to exercise supplemental jurisdiction over Plaintiff's pendent claims under the NYSHRL and the NYCHRL. 28 U.S.C. § 1367(c)(3) affords a district court the discretion to "decline to exercise supplemental jurisdiction over" non-federal claims if it "has dismissed all claims over which it has original jurisdiction." When considering whether to retain jurisdiction, a court balances "the traditional values of [i] judicial economy, [ii] convenience, [iii] fairness, and [iv] comity." *Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988)). The Second Circuit counsels in favor of dismissing state-law claims in this setting. *Jordan* v. *Chase Manhattan Bank*, 91 F. Supp. 3d 491, 511 (S.D.N.Y. 2015) (quoting *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998)).

All factors favor declining jurisdiction over Plaintiff's state-law claims. First, this case is still in the early pleading stages and thus judicial economy militates in favor of dismissing the state and local claims. *See Chenensky* v. *N.Y. Life Ins. Co.*, 942 F. Supp. 2d 388, 392 (S.D.N.Y. 2013). Second, refiling these claims in state court would be no more than a minor inconvenience given the early stage of the litigation, and third, the parties will not suffer any

disadvantage in state court. Finally, because only state and local law issues remain, comity counsels in favor of Plaintiff proceeding in state court. *See LLM Bar Exam, LLC* v. *Barbri, Inc.*, No. 16 Civ. 3770 (KPF), 2017 WL 4280952, at *30 (S.D.N.Y. Sept. 25, 2017).

## D. Leave to Amend Is Denied

In a letter to the Court following the briefing on this motion, Plaintiff requested leave to amend his pleadings for a second time. (Dkt. #32). Rule 15(a)(2) provides that a court should freely grant leave to amend "when justice so requires." *McCarthy* v. *Dunn & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see also* Fed. R. Civ. P. 15(a). However, the Court agrees with Defendants that granting leave to amend would be futile. (Def. Reply 3). Leave to amend may be denied where it would be futile, or, put differently, if the "amended portion of the complaint would fail to state a cause of action." *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000). Plaintiff has already been permitted to amend his pleadings once after hearing a preview of Defendants' arguments in their pre-motion letter and during a lengthy pre-motion conference, at which the Court offered Plaintiff an extended opportunity to explain his claims.

What is more, Plaintiff has effectively amended his pleadings a second time by submitting an "updated sequence of events" in his memorandum in opposition to Defendants' motion to dismiss. (Pl. Opp. 3-9). Plaintiff continues to raise his claims in conclusory fashion, and when pressed for further detail, Plaintiff has suggested that Defendants' actions were not motivated by racial

23

animus — a fact that does significant damage to his racial discrimination claim.  Plaintiff requested leave to amend in a letter to the Court but has not indicated how he would amend his claims.  (Dkt. #32).  On this record, the Court cannot conceive of how Plaintiff could overcome the pleading deficiencies identified in this Opinion, and accordingly denies leave to amend.

## CONCLUSION

It is clear from Plaintiff's various pleadings and statements that Plaintiff believes any disparate treatment at AECOM, including his termination, was the product of an overarching scheme to coerce him to enlist in the military.  While there are reasons to be skeptical of the existence of that scheme, the finer point is that Plaintiff concedes that the conduct was not the result of discrimination based a protected characteristic.  For all of these reasons, Defendants' motion to dismiss is GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     February 22, 2018
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

A copy of this Order was mailed by Chambers to:

Nicholas Weir
135 Rhodes Avenue
Hempstead, NY 11550

24